## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        v.<br><br>19. ROBERT LARA, aka "King Rizz," and<br>35. TYSONE JORGE, aka "King Music,"<br><br>        Defendants. | Case No. 19-CR-10459-RWZ |

## GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS SEEKING REVIEW OF THE PROTECTIVE ORDER

### Introduction

On August 14, 2020, the Magistrate Judge (Bowler, M.J.), upheld a protective order issued in this matter which restricts the dissemination of "materials that may identify a cooperating witness, a non-law enforcement witness, or a crime victim in the case." [D. 703, p. 2, ¶ f)] and [D. 1224, p. 3]. As it relates to the two defendants seeking review, the protective order provides that those defendants may review the protected discovery in this matter with counsel but may not themselves possess copies of the protected materials.[1] [D. 703, p.2 ¶g] and [D. 1224, p. 4-5]. As noted by the Magistrate Judge, these measures were warranted by "***undeniably valid***" government concerns for the safety of cooperators and witnesses. [D. 1224, p. 10] (emphasis added).

By way of the motions for review, the Defendants argue that there is a dearth of evidence that they personally threatened or intimidated witnesses. Thus, they posit, the issuance of the

---

[1] For detained defendants, the government has provided laptops or thumb drives to the facilities where those individuals are detained. Detained individuals may review the discovery on those laptops. No detained defendant has appealed the protective order.

protective order is clearly erroneous and contrary to law.  As an additional argument, the

defendants further argue that Magistrate did not properly balance the risks to witnesses against

the burden on the defendants.

Neither argument holds water.  The defendants do not contest, at all, the documented

instances where the Latin Kings organization and its members have: (1) engaged in witness

intimidation; (2) undertaken efforts to identify cooperators using court paperwork; and (3)

coordinated assaults and retaliation against individuals cooperating with law enforcement.

Instead, the defendants argue that a protective order cannot be suitable as to them, in the absence

of evidence that they "personally" threatened witnesses.

As more fully detailed below, the defendant's argument urges this court to adopt an

erroneous (and illogical) legal standard.  Neither Fed. R. Crim. P. 16, nor case law, requires that

a defendant be personally involved in threats toward witness for a protective order to be

appropriate.  As regards the balancing of the risk to witnesses against the burdens on the

defendants from the protective order, the Defendants identify no error at all, let alone the clear

error that would be required to warrant review.

At the end of the day, the Defendants would prefer that the Magistrate reached different

factual conclusions.  But that wish falls well short of what is required to warrant reversal.

<u>Procedural History</u>

At issue in this appeal is the August 14, 2020 Order of the Magistrate Judge upholding

the restrictions imposed by a previously temporary protective order entered into to allow

discovery to proceed while the parties litigated the terms of a final protective order.  That order

was issued after extensive litigation on the issue.

On January 17, 2020, the government moved for a protective order as to all discovery in this action, and sought to apply that blanket order to all defendants.  [D. 359].  After hearing on February 7, 2020, the Magistrate Judge denied the protective order, albeit without prejudice.  The Magistrate Judge identified two flaws in the government's first proposed Order:

> The government's attempt to group all defendants into one category with heightened and significant restrictions of discovery access suitable for only certain defendants, however, is overbroad, does not account for different levels of violence and retaliation by different defendants or segmented groups of defendants, and generally fails to make the necessary showing of good cause. Second, the proposed protective order makes no distinction between different categories of discovery material thus grouping the mundane and routinely-produced material with highly confidential material, such as information that would reveal the identity of a cooperating witness.

[D. 508] Electronic Order, February 12, 2020.  The Magistrate Judge suggested that the parties work to agree upon the terms of a mutually agreeable order.

On March 25, 2020, the parties entered into an agreement for the issuance of a more limited temporary protective order, which was issued on April 7, 2020.  [D. 630, 703].  Pursuant to that temporary order, which now governs the discovery in this case, the discovery materials have been categorized as "protected" and "unprotected."  Only "protected" materials, those that may identify cooperating witnesses, civilian witnesses, or crime victims, are restricted from dissemination.  Protected materials may be possessed and used by the defense teams (and can even be shown to prospective defense witnesses), but, copies of those materials may not be disseminated.  [D. 703].

On May 29, 2020, the Defendants filed a motion seeking a "particularized showing of good cause for the protective order."  [D. 948].  Slightly more than half of the defendants joined the motion.  On June 19, 2020, the government filed its initial response.  [D. 1009].  On June 30, 2020, the Magistrate held a hearing on the motion.  [D. 1096].  Subsequent to that hearing, in

lieu of an evidentiary presentation and recitation of facts by the government, the government was directed to provide a written statement and exhibits in support of the order detailing the facts and evidence upon which it would rely in support of the protective order. *Id*. No party objected to that proposed course. *Id.*

On July 14, 2020, the government submitted a 61 page filing (with exhibits), detailing, as to each defendant challenging the protective order, the facts and evidence in support of its request. [D. 1114]. On July 22, 2020, the Magistrate Judge allowed the defendants an additional week to respond to the government's filing. [D. 1142]. Several defendants, including Lara and Jorge, filed further responses. [D. 1128, D. 1134, 1137, 1138, 1145, 1149, 1153, 1158, 1160, 1161, 1164, 1166, 1177, 1200].

As it relates to the issue now on appeal to this Court, after months of litigation and dozens of filings, the Magistrate Judge chose to uphold the protective order's restrictions upon dissemination of discovery materials identifying cooperators, victims, or witnesses. Briefly, as it relates to Lara and Jorge, protected discovery materials would be provided to counsel, and could be reviewed by the defendants in the presence of counsel, but the defendants were not permitted to retain copies.

The Magistrate's Findings

The Magistrate began by noting that Fed. R. Crim. P. 16(d) allows the issuance of protective orders for "good cause," further noting that such orders must be based upon a case specific factual showing rather than generalized assertions of potential harm. *See, e.g., United States v. Williams*, 2015 WL 5923551 (D.Mass. 2015); and *United States v. Bulger*, 283 F.R.D. 46 (D.Mass. 2012). The Magistrate then noted the defendants' arguments concerning the burdens imposed by the order. As relevant to the two defendants seeking review, the Magistrate

considered the fact that the defendants (or their attorneys) would have to travel to view the discovery.

Weighing the arguments in favor of the order, the Magistrate Judge found that:

the government has a real and substantial concern of protecting cooperating witnesses against acts of retaliation and even death….The government also has a real and viable concern of protecting victim and non-law enforcement witnesses from acts of violence and threats.  It articulates and elucidates those concerns relative to the dangers posed by each defendant[2]…(Docket Entry # 1009-2, ¶ 3).

[D. 1224, p. 4].

The Magistrate found that the Latin Kings criminal enterprise required its members to seek out law enforcement paperwork and provide other members with any document that tends to identify members who are cooperating with law enforcement. [D. 1124].  That finding was supported by several case specific examples, including findings

---

[2] Among the objections of Tyson Jorge is a claim that the Magistrate Judge didn't review the evidence or make findings as to him.  "The Disputed Order never mentions his name of any allegation against him, and does not even make passing reference to having considered Defendant's response." [D. 1256, p. 4].  The extensive history of the protective order litigation and the express findings of the Magistrate Judge's opinion gives lie to this claim.  First, the opinion need not mention any of these items to be upheld under the deferential standard of review.  *See, e.g., Ferring Pharm. Inc. v. Braintree Labs., Inc.,* 168 F. Supp. 3d 355, 363 (D. Mass. 2016)("The memoranda filed with Magistrate Judge Bowler and the transcript from the January, 2016 hearing indicate that Ferring raised its arguments regarding proportionality on multiple occasions. Under the deferential standard applicable to such fact-intensive rulings by magistrate judges, the fact that Magistrate Judge Bowler did not expressly reference proportionality in her ruling does not render her ruling contrary to law.")  The Magistrate was hardly unaware of the requirement that the government make a showing as to each defendant, she had previously made that express ruling.  Further, even cursory review of the decision gives lie to this claim.  The Magistrate Judge made the requisite finding as to "*each defendant*."  [D. 1224, p. 8].  And the Magistrate Judge did so, "[h]aving reviewed *all* of the relevant records…" *Id.*, p. 10 (emphasis added).  Further illustrating the individualized review undertaken, the Magistrate excepted three defendants from the order based upon individualized factors in their specific cases.  *Id.*, p. 8.

made by this Court in the course of contested detention proceedings.   [D. 1124, p. 7-8],

[D. 1114, p. 3-6]; [D. 1084, p. 4].[3]

Balanced against the government's concerns, the Magistrate Judge weighed the

burden upon the defendants imposed by the order, specifically the burden to travel to

meet with counsel.  Weighing the two competing issues, the magistrate found that:

> the government's concern of protecting government and non-law enforcement
> witnesses as well as victims against retaliation, acts of violence, witness
> intimidation, and other harm ***is undeniably valid***, and sufficiently established in
> the record to provide good cause for the restrictions imposed by the PTO.

[D. 1224, p. 10] (emphasis added).

<u>Defendants' Appeal</u>

In this appeal, the defendants, Lara and Jorge, claim that there is a dearth of

evidence that they personally threatened, injured, or intimidated witnesses.  Accordingly,

they contend, the entry of a protective order is both clearly erroneous, and contrary to

law.  They further contend that the Magistrate failed to appropriately consider the burden

imposed upon them by the protective order.

## **ARGUMENT**

### **A.  Standard of Review**

The Magistrate Judge's ruling on the protective order is reviewable under 18 U.S.C.

§636(b)(1)(A).  That provision provides, in relevant part:

> A judge of the court may reconsider any pretrial matter under this subparagraph
> (A) where it has been shown that the magistrate judge's order is clearly erroneous
> or contrary to law.

---

[3]That such conduct was carried out by members of the organization is not even disputed.
Nor could it be.  Recently, one of the defendants noted to have engaged in such conduct pled
guilty to, among other things, seeking to identify and punish individuals cooperating with police
for violating the rules of the Latin Kings.  [D. 1308].

*Id*.  The Magistrate's factual findings are reviewed under the "clearly erroneous" standard.  "This means that [this Court] must accept both the [Magistrate's] findings of fact and the conclusions drawn therefrom unless, after scrutinizing the entire record, [this Court] form[s] a strong, unyielding belief that a mistake has been made."  *Phinney v. Wentworth Douglas Hosp*., 199 F.3d 1, 4 (1st Cir. 1999) (quotations omitted).  "[W]hen the evidence gives rise to competing interpretations, each plausible, the factfinder's choice between them cannot be clearly erroneous." *Id*.

### B.  The Magistrate's Findings of Fact Are Amply Supported

As delineated above, the Magistrate Judge reviewed the government's 61 page evidentiary submission with exhibits and found a number of facts relevant to the protective order.  First, that members of the Latin Kings, including those released from custody, are required to seek out law enforcement paperwork and provide other members with any document that tends to identify members who are cooperating.  There was ample basis for that finding in the government's evidentiary submission, which included two statements of cooperating witnesses stating exactly that.  [D. 1009-1, D. 1009-2].

In addition to those statements, testimony, reports, and exhibits submitted along with the government's 61 page evidentiary filing set out numerous case specific examples where the members of the organization had done exactly that.  [D. 1114].  The Magistrate Judge cited examples to highlight the point, such as: (1) a documented and recorded instance where members of the Latin Kings specifically discussed sharing court paperwork so that an individual suspected of cooperating could be assaulted (while in prison); (2) findings of this Court that another member of the organization demonstrated "dedication to uncovering the identities of confidential witnesses and marking those witnesses for assaults." [D. 1124, p. 7-8]; [D. 1084, p. 4].

7

The Defendants do not challenge this finding.  Nor could they.  Under the "clearly erroneous standard, such a challenge is hopeless.

The Magistrate further found that "[t]he government … has a real and viable concern of protecting victims and non-law enforcement witnesses from acts of violence and threats. It articulates and elucidates those concerns relative to the dangers posed by each defendant." Examples abound.

- Luis Mendez shared criminal discovery and boasted on a recorded telephone call with codefendants Jorge Rodriguez, and Jayco Reyes-Smith about the efforts to intimidate victims who had been shot multiple times by Reyes-Smith (Victims 21 and Victim 22).  As Mendez informed Reyes, the victims would not be appearing at court because Mendez had already talked to them.[4]  [D. 1114, p. 10]

- Victim 34, a member of the Fitchburg Chapter, was targeted by the Latin Kings for his cooperation with law enforcement.  An intercepted call between Israel Rodriguez and Michael Cotto demonstrated their efforts to locate Victim 34 and lure him to a meeting where he will be violently assaulted.  During the call, Cotto and I. Rodriguez discuss their review of the "papers" relating to the cooperation.  [D. 1114, p. 14-15]

In addition to the violent conduct of the enterprise, and the prior violent convictions of numerous Defendants charged in this case, multiple defendants in this case have specifically threatened and intimidating witnesses involved in court proceedings:

- Luis Santiago was convicted of threatening to kill a woman *and her children* because she had called DCF on him.  [D. 1114, p. 28]

- Orlando Santiago-Torres was convicted of threatening a victim outside of the New Bedford courthouse, stating "'I know where you live. And tell your husband to keep his fucking mouth -- keep his mouth shut in court.'"[D. 1114, p. 3]

- Angel Rodriguez has been twice convicted of witness intimidation. The first involved him brandishing a knife and threatening a victim of an armed robbery. ("After the robbery, the victim approached a police cruiser to report the crime, and while he was

---

[4] See D. 919, Exhibit 3 ("The only way that we're fucked is if the witnesses go to court. And I already talked to them and shit, my nigga. I talked to both of them and shit, nigga.).

awaiting assistance, Rodriguez stood across the street and "brandished a knife and proceeded to stare at the victim.'" "Rodriguez pleaded guilty to the witness intimidation charge and was sentenced to six months' incarceration."). The second incident involved a vicious domestic violence incident, where Rodriguez repeatedly punched his girlfriend in the face, and threw her face first into a metal bedframe. When police arrived, Rodriguez told the victim to be quiet and not say anything to the police or she would get hurt again. While he was in custody awaiting a dangerousness hearing in the Lowell District Court, he placed multiple recorded calls to the victim and intimidated that she should not show up at court. In November 2017, Rodriguez pleaded guilty to all four charges and was sentenced to 2.5 years' incarceration and probation of three years. [D. 1114, p. 48-50]

- Angel Calderon has a pending witness intimidation charge in Dorchester District Court. According to the incident report, in June 2019, the Defendant "ran up to [the victim], pulled out a black firearm, chambered a round, and then put it up to her face" and "then said, 'you've been snitching. I'll kill you and your brothers.'" [D. 1114, p. 58-59]

Again, the defendants do not challenge the litany of violent acts related in the government's submission.

### C. The Magistrate Could Reasonably Infer That Jorge And Lara Would Abide by The Rules of the Organization

By way of this appeal, the defendants challenge a factual finding, disguising their disagreement as a legal claim. To explain, the Magistrate Judge made a finding as to the rules of the Latin Kings organization and appropriately inferred that members of the organization, including these defendants, would abide by its rules, including the rules regarding the sharing of court paperwork. Contending otherwise, the defendants suggest that there was a dearth of evidence that they *personally* shared court paperwork or threatened witnesses. But in so doing, the defendants lump an erroneous legal standard upon an already flawed attempt to characterize a factual finding as a legal one.

Contrary to what the defendants suggest, there is not, and never has been, a legal requirement that the government demonstrate that the subject of a protective order was

9

personally involved in the threats toward witnesses.  A protective order can be appropriate when there is a threat to the safety of witnesses, victims and cooperators, regardless of the source.

The Federal Rules of Criminal Procedure recognize the need to balance various concerns in determining how much discovery to provide and how best to provide it. Importantly, the Rules make clear that "at any time the court may, for good cause, deny, restrict, or defer discovery or inspection." Fed. R. Crim. P. 16(d).  Since 1966, when the "good cause" standard was first incorporated into Fed. R. Crim. P. 16(d), there has been a recognition that discovery materials should be restricted or protected when disclosure may impact the safety of individuals or lead to witness intimidation.  "Among the considerations to be taken into account by the court will be the safety of witnesses and others, a particular danger or perjury or witness intimidation…." Fed. R. Crim. P. 16(d), Advisory Committee Notes to the 1966 Amendments.  The 1974 advisory committee notes similarly recognize the "obvious" appropriateness of a protective order "where there is reason to believe that a witness would be subject to physical or economic harm if his identity is revealed." Fed. R. Crim. P. 16(d), Advisory Committee Notes to the 1974 Amendments.  Nowhere do the rules require that a defendant *personally* threaten a witness.

Case law is in accord. As regards the claim now advanced, that only some of the members of the organization had personally threatened or injured witnesses, the Magistrate noted the District of Columbia Circuit's holding in *United States v. Celis*, 608 F.3d 818, 832 (D.C. Cir. 2010).  That case involved both a protective order and an order allowing witnesses to testify under pseudonyms. In upholding the extensive protective measures in that case, the D.C. Circuit rejected claims that those protective measures could not be justified in the absence of evidence that the defendants had been personally involved in violence against witnesses, holding, that the suitability of a protective measures, "***does not depend on whether the threat to the witness comes directly from a defendant***

10

*or from another source*." *Id.* (emphasis added). The D.C. Circuit is not alone in adopting this view. *Accord United States v. Ramos Cruz*, 667 F.3d 487, 501 (4th Cir. 2012) (agreeing with the principle that a particular defendant need not personally threaten witnesses for a protective order to be appropriate); *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1141 (10th Cir. 2014) (when seeking measures to protect a witnesses' safety, the "threat need not come from the defendants themselves.")   Thus, in urging this Court to overturn the Magistrate's ruling based upon a claim that they were not personally involved in threatening witnesses, the defendants urge this Court to adopt an erroneous legal standard. That invitation should be declined, for the obvious reason that it is an incorrect statement of the law.

What matters is that the Magistrate Judge appropriately concluded that the cooperators, witnesses, and victims in this case faced the possibility of retaliatory violence from the members of this organization. That risk, in accord with the clear terms of Fed. R. Crim P. 16, warrants the imposition of the protective order in this case.

As it relates to Jorge and Lara, the Magistrate further found that members, such as Jorge and Lara, were subject to rule of the Latin Kings that required the sharing of court paperwork to identify witnesses and informants for assault.   Evidence in this case was wholly consistent.  The government's evidentiary submission provided case specific examples demonstrating that the organization kept detailed records, even spreadsheets, of individuals who had cooperated, that the organization sought to identify cooperators by collecting court paperwork, and that the organization carried out assaults (and worse) on suspected cooperators and witnesses.

Given that demonstrated history of violence, the existing order is certainly warranted. The dissemination of protected discovery to the members of this organization who have access to the internet and social media simply could not be controlled.   Even in the absence of evidence

that a particular defendant would engage in witness intimidation themselves, there is case specific evidence in this case that all members would be obligated to share court materials identifying cooperating and other witnesses so that they could be intimidated. Such individuals would still be required by the rules of the organization to be a link in the chain, leading to such intimidation. Further, there are case specific examples and evidence demonstrating that there are members of the Latin Kings willing and able to engage in witness intimidation if provided information identifying cooperators and witnesses.

Above and beyond all of the foregoing,[5] the government's evidentiary submission provided a clear basis from which the Magistrate appropriately concluded that the protective order should be applied to Lara and Jorge.

### Robert Lara (19)

Detention proceedings as to Mr. Lara were held before MJ Dein. The Court heard testimony that Lara had been identified as a longstanding member of the D5K chapter of the Latin Kings. Tr. 12/13/19 [D. 292], p. 25. The agent testified about Lara's attendance at a series of meetings of the Latin Kings addressing "renegade" chapters.[6] During a February 2018 meeting attended by Lara, one of the leaders issued a "greenlight" on an individual responsible for a "renegade" chapter. Tr. 12/13/29 [D.292.], p. 26-28; Aff. SA Coppo [D. 12-1], ¶250-257. During another meeting attended by Lara on January 12, 2019, leaders of the Latin Kings

---

[5] In highlighting individual specific evidence, the government would re-iterate, in light of the clear language of Fed. R. Crim. P. 16(d), and the case law regarding protective orders, the Court should not accept the defendants' invitation to ignore the totality of the circumstances and the government's evidence as to the organization as a whole.

[6] "Renegade" chapters were members claiming to belong to the Latin Kings who were not reporting to the appropriate individuals within organization. Tr. 12/13/19 [D. 292], p. 26.

concluded that members of "renegade" chapters who did not report should be shot.  Tr. 12/13/19 D. 292], p. 30-33; Det. Exhibit 2 (recording of the January 12, 2019 meeting). Portions of the recording of the January 2019 meeting were played, and Lara was identified in the video by the testifying agent.  Tr. 12/13/19 [D. 292], p. 31.

On a further day of the detention proceedings, the court heard testimony and watched a video exhibit from another gang meeting.  One of the purposes of the meeting was to impose "violations" for misconduct that had been committed by two Latin Kings members. Tr. 12/23/19 [D. 342], p. 6, 19-20. During the meeting, it was determined by leadership that two members would be beaten, each for a full minute.  As explained by the agent:

> the violation that was given was a one-minute violation, a standard punishment where the member getting violated would hold his crown or gang sign of the Latin Kings above his head, exposing his rib cage, and stand facing away from the individual giving the violation. The individual giving the violation then would punch the rib, kidneys and legs for the duration that was determined for this incident. It would have been one minute.

Tr. 12/23/19 [D. 342], p. 6.

The ensuing assault was captured on video.  While the beating is administered often partially or wholly off camera, the recording captures many disturbing aspects of the assault.  At the outset, the individual identified as Lara can repeatedly be seen, at least eight times in the first seven seconds, with his arm cocked back to strike, then violently, rapidly, and forcefully, punching forward.  Though these punches land outside what can be seen in the video, the audio recording appears to capture the sound of each blow landing, along with the groans and shouts of the victim.  Dozens of blows are heard being struck over the course of the one minute beating. As this occurs, members of the gang, spectating, encourage the victim to "crown up," *see supra*, while others instruct Lara to strike the victim both in the upper body and legs, stating, "Legs too," and "[g]et the ass cheeks."

13

After the beating (confirming the violence of the assault), Lara can be heard to say that his knuckles were bleeding, and, the victim can be heard complaining that his ribs had been broken. *See* Det. Exhibit 3 (excerpt of the March 17, 2019 meeting); Det. Exhibit 4 (full video); Det. Exhibit 5 (incident report); Tr. 12/23/19 [D. 342], p. 10-11, 29.[7]

As regards the suitability of a protective order, the evidence demonstrates Mr. Lara's capacity for violence, and, his willingness to engage in such violence at the direction of other Latin Kings.  It was well within the Magistrate Judge's discretion to conclude that an individual willing to viciously beat another member of the gang at the directions of superiors, would not hesitate to share discovery materials identifying cooperators upon similar instructions.  It was similarly well within the Magistrate Judge's discretion to conclude that such an individual would not hesitate to share information on cooperators as required by the organization's rules.

This incident also provides additional case specific evidence to support the existing protective order as it relates to all members.  This incident is demonstrative of the punishments that members of the gang can expect to receive, should they fail to follow the rules of the gang.  If members who are provided unrestricted access to discovery materials do not share discovery, they face similar, or worse, punishment by other members of the gang.

### **Tyson Jorge**

Jorge was captured in a February 3, 2019 recording discussing the assault on a victim by numerous members of the Latin Kings, was present during an August 2019 recorded ceremony in which a new member was admitted to the gang ("crowned."), was depicted in gang videos,

---

[7] On the complete copy of the video, admitted by defense counsel, a second, similar, beating of another member of the gang is depicted.  *See* Det. Exhibit 4, and Tr. 12/23/19, p. 22-23.

and, was involved in the narcotics trafficking activities of the gang. Aff. SA Coppo [D. 12-1], ¶276, 279, 357, 363, 381.

Tyson Jorge was captured on a February 10, 2019 recording discussing the recent robbery of a trap house, and that shots had been fired by a Latin King member (Raekwan Paris, a/k/a "King Debo"), at the rival gang members responsible. *See* Exhibit 7 (transcript of 2/10/19 recording); Exhibit 10.

Tyson Jorge was also captured during a July 10, 2019 recording in an apartment within a Latin Kings trap house. During the recording, Jorge Rodriguez, a/k/a "King G," can be observed cooking approximately 500 grams of cocaine base. *See* Exhibit 2 (still images from 7/10/19 recording), Exhibit 9 (report dated July 16, 2019).

Additionally, Tyson Jorge was captured on an October 24, 2019, recording where the gathered Latin Kings discussed the response to the recent murder of a probationary member.  See Exhibit 8 (transcript of 10/24/19 recording), Exhibit 10 (recording).  During the recording, Tyson Jorge can be heard telling the members to report any observations of rival gang members to the chain of command, and compartmentalizing the knowledge of the leaders:

> Find out who the third ([the Enforcer]) is and that's who you need to call, that who you talk on there's a problem anything that's goin on, that's appointed in this chapter, in this station. That's the guy to call, he's gonna call everybody up, he's gonna make sure he talks to the second and the first. You know what I'm saying.

See Exhibit 8, p. 10.  Tyson Jorge then reminds the members that when the leadership calls and is looking for a response team, "They including you into the combat they about to bring. So understand that, this ain't no game."  See Exhibit 8, p. 11. After hearing, Jorge was released on conditions.  [D. 272, 327, 328].

As regards the suitability of a protective order, it was well within the Magistrate Judge's discretion to conclude the evidence demonstrated Mr. Jorge's willingness to engage violence on

behalf of the Latin Kings and his involvement in the narcotics trafficking activities of the organization.[8]  In light this, it was well within the Magistrate Judge's discretion to conclude that there is "good cause" to show that Jorge would be willing to take steps to share discovery relating to cooperating witnesses if directed to do so by superiors and/or pursuant to the rules of the organization, was willing and capable of acting violently against cooperators, either himself, or through others, and, was unlikely to abide by the terms of any protective order entered by this Court.

Further, in light of his extensive participation in gang activities, it was well within the Magistrate Judge's discretion to conclude Jorge is undoubtedly aware of the consequences he will face for failing to abide by the organization's rules to share information relating to witnesses and cooperators.  There were several, case-specific instances of members sharing court paperwork to identify cooperators and to justify retaliation, assault, and intimidation of those witnesses.  Additionally, there were numerous case specific examples, including audio/video recordings, demonstrating the consequences to members who do not obey the organization's rules, including the vicious one minute beating administered by Robert Lara.  *See supra*.

Against such a robust factual backdrop, the defendants' attempt to suggest that the Magistrate's factual findings were clearly erroneous is beyond hopeless.  Further,

---

[8] Defense counsel suggests that this is not evidence that Jorge, personally, was involved in shootings or violence.  But even assuming *dubitante* that were true, the recordings remain valuable evidence as to the issue before the Court.  Jorge is clearly aware of, and untroubled by, both the organization's narcotics trafficking activities and also the violence (i.e., shootings) that necessarily accompany such activities.  And this remains true whether the Court reviews the February 2019 recordings specifically discussing a shooting or the other recordings in which the members discussed retaliatory violence against other gangs.  Jorge is certainly aware that the organization stands ready to advance its goals through violence, and remains a willing member.  Further, as noted above, the suitability of a protective order does not depend on a specific defendant's personal involvement in threats to witnesses.  *See supra*.

because the defendants fail to identify any error of law, and indeed, advance an incorrect

legal theory to this court, there is no basis upon which to overturn the protective order as

a matter of law.

## II.     Defendants' Arguments Concerning the Appropriate Balance to Be Struck Between the Threats to Witnesses and the Burden upon the Defendants Fail to State a Basis for Reversal

Both Defendants contend that the Magistrate's order has struck an incorrect balance

between the dangers to witnesses and cooperators and the burdens upon the defendants.  The

crux of their argument is that their clients would have difficulty meeting with counsel because of

the COVID pandemic.

In the case of Mr. Lara, the pandemic allegedly prevents a lengthy meeting with counsel.

In the case of Mr. Jorge, counsel alleges that his client is unable to drive, and cannot travel to

meet with counsel because of the pandemic.

Such argument fail at the outset.  The issue on appeal is not what balance this Court

would strike were it writing upon a clean slate.  The issue is whether, in balancing the factors,

the Magistrate's reached a clearly erroneous conclusion.  No such showing has been made.  At

best, the defendants would prefer that the Magistrate had struck a different balance.   But the

Magistrate's decision falls well within her broad discretion as the trier of fact.   It is certainly not

error, let alone clear error, even if another court may have balanced the factors differently.

Further, there is simply no reason to strike a different balance.  To the extent that the

pandemic is cited as ground for refusal to travel, that argument is not compelling.  The threat

posed by the COVID epidemic has, indisputably, diminished.  Many workplaces and schools

have reopened.  Sports, even youth sports, have resumed.  More significantly, the Courts, both

state and federal, are resuming in person proceedings and jury trials.  Grand Juries have resumed

hearing in person testimony.

      If the risk has sufficiently diminished such that court personnel, jurors, witnesses, and

others can be expected to both make travel arrangements and attend lengthy court proceedings,

there is simply no reason why the defendants cannot travel to meet with counsel.

**<u>Conclusion</u>**

      For the foregoing reasons, the Court should decline to review or modify the protective

order in this action.


                  Respectfully submitted,

                  ANDREW E. LELLING
                  United States Attorney

            By:  *<u>/s/ Mark Grady</u>*
                  Mark Grady
                  Assistant United States Attorney


**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.


            By:  *<u>/s/ Mark Grady</u>*
                  Mark Grady
                  Assistant United States Attorney

Date: September 21, 2020